NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220875-U

NOS. 4-22-0875, 4-22-0876 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 7, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.D. and A.D., Minors; | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | Nos. 20JA136 |
| v. | ) | 20JA137 |
| Harold D., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Erin B. Buhl, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding that (1) respondent forfeited his argument that the State failed to prove he was an unfit parent because it failed to prove the Department of Children and Family Services had made reasonable efforts to provide him with the services in the service plan and (2) the trial court's determination that it was in the best interests of the minors to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    The State filed petitions alleging B.D. (born January 2, 2014) and A.D. (born January 21, 2012) were neglected in that they were in an environment injurious to their welfare. Respondent, Harold D., the minors' father, stipulated that the minors were neglected, and the trial court entered dispositional orders finding respondent was unfit or unable to care for, protect, train, or discipline the minors. The court placed custody and guardianship of the minors with the

Illinois Department of Children and Family Services (DCFS) and ordered respondent to complete the services required by DCFS. Thereafter, the State filed motions for termination of respondent's parental rights as to each of the minors. Following a hearing, the trial court found that the State had proven that respondent was unfit and that it was in the best interests of the minors that respondent's parental rights be terminated.

¶ 3         Respondent appeals, arguing the State failed to prove he was unfit because it failed to prove DCFS made reasonable efforts to provide the services required under the service plan. He also argues the trial court erred in finding it was in the best interests of the minors that his parental rights be terminated because the State had "subverted" his relationship with the minors. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5         On May 13, 2020, the State filed neglect petitions alleging B.D. and A.D. were neglected in that they were in an environment injurious to their welfare. The State did not initially move for shelter care for the minors.

¶ 6         On October 28, 2020, the State filed amended neglect petitions as to B.D. and A.D., alleging the minors were in an environment injurious to their welfare in that: (1) their mother, Rachel D., had substance abuse issues that prevented her from properly parenting them, (2) their home was dirty and lacked hot water, and (3) Rachel and her paramour engaged in acts of domestic violence in front of the minors. A statement of facts filed at the same time as the amended neglect petitions stated that respondent, Rachel, Rachel's paramour, and the minors all resided in the same house. The statement of facts indicated that, on October 25, 2020, Rachel and her paramour had a physical altercation in the residence while the children and respondent were

home, and Rachel went missing later that night. Rachel was found deceased on October 27, 2020.

¶ 7            Respondent waived his right to a shelter care hearing, and the minors were placed in the temporary custody of DCFS. At an adjudicatory hearing on January 27, 2021, respondent stipulated the minors were neglected in that Rachel and her paramour engaged in acts of domestic violence in their presence. The State agreed to dismiss the other two neglect counts, but respondent agreed that the services he was directed to complete could be based on all three counts. On April 21, 2021, upon agreement of the parties, the trial court entered dispositional orders finding respondent was unfit or unable to care for, protect, train, or discipline the minors. The court placed custody and guardianship of the minors with DCFS and ordered respondent to complete the services required by DCFS.

¶ 8            Permanency reviews were held on October 4, 2021; January 25, 2022; and July 12, 2022. At each of these hearings, the court found DCFS, through its contracted agency, Lutheran Social Services of Illinois (LSSI), had made reasonable efforts to follow the service plan. Respondent did not object to these findings at any of the permanency reviews. At the first two permanency reviews, the court found respondent had made neither reasonable efforts nor reasonable progress toward the return of the minors. At the permanency review on July 12, 2022, the court found respondent had made reasonable efforts but not reasonable progress toward the return of the minors. The court then changed the permanency goal from return home within 12 months to substitute care pending court determination on termination of parental rights.

¶ 9            On July 13, 2022, the State filed motions for termination of parental rights regarding both of the minors. The State subsequently filed amended motions alleging respondent was unfit in that he failed to (1) maintain a reasonable degree of interest, concern, or

responsibility as to the minors' welfare; (2) make reasonable efforts to correct the conditions that caused the minors to be removed during a nine-month period after the neglect adjudication; and (3) make reasonable progress toward the return of the minors during a nine-month period after the neglect adjudication. Regarding the allegations that respondent failed to make reasonable efforts, the nine-month periods at issue were the periods from January 27, 2021, through October 27, 2021, and April 25, 2021, through January 25, 2022. With regard to the allegations that respondent failed to make reasonable progress, the nine-month periods at issue were the periods from January 27, 2021, through October 27, 2021; April 25, 2021, through January 25, 2022; and October 12, 2021, through July 12, 2022.

¶ 10        On September 8, 2022, a hearing was held on the unfitness portion of the State's amended motions for termination of parental rights. At the State's request, the trial court took judicial notice of the neglect petitions, the amended neglect petitions, the temporary custody order, the adjudication order, the dispositional order, the permanency review orders, the motions for termination of parental rights, and the amended motions for termination of parental rights.

¶ 11        Jennifer Downey, a child welfare specialist from LSSI, testified she had been assigned to the minors' case since July 2021. Downey identified an integrated assessment approved January 25, 2021, and it was admitted into evidence. Downey also identified eight family service plans, which were admitted into evidence. Two of the plans were approved July 13, 2022. The remaining plans were approved April 9, 2020; November 12, 2020; January 27, 2021; April 22, 2021; September 24, 2021; and April 4, 2022. The service plan approved January 27, 2021, indicated LSSI needed to refer respondent for a mental health assessment. The service plan approved April 22, 2021, stated respondent had completed a mental health assessment in March 2021, and he needed individual counseling due to experiencing hallucinations in the past

and for his lack of accountability for the children's neglect. The service plan approved April 4, 2022, stated respondent had been engaging in weekly therapy sessions, and a psychological evaluation was conducted on March 22, 2022. The service plans also indicated respondent obtained subsidized housing, and his former sister in-law helped him clean his home each week.

¶ 12    Downey testified the children were taken into care due to neglect. Specifically, the children had not been going to school, there was no food in the home, their mother was determined to have been murdered, and there was domestic violence in the home. Downey stated respondent was not the perpetrator of the domestic violence, but he witnessed it. Respondent kept in contact with LSSI, and he was informed of the importance of completing services. He was asked to complete a substance abuse assessment, individual therapy, family therapy, and parenting services.

¶ 13    Downey stated she did not believe respondent had substance abuse issues. She stated that, since she was assigned to the case, all of his drug drops came back negative, and he was attending Alcoholics Anonymous meetings. The service plans showed respondent had completed a substance abuse assessment, and it was not recommended that he complete substance abuse services. The service plans also showed he tested positive for drugs on two occasions—he tested positive for tetrahydrocannabinol in November 2020 and for cocaine in May 2021.

¶ 14    Downey testified respondent was referred for individual counseling but was discharged in July 2021. One of the service plans indicated this was due to respondent's failure to attend or call the agency. Downey stated she referred him again to the same agency, but he was told he would have to wait three months because he did not complete counseling the first time. Downey then referred him to a different counseling agency but learned after approximately

three months that it would not accept respondent as a client. Downey referred respondent to a third agency in November 2021, and respondent began attending counseling in late December 2021 or early January 2022. He attended counseling regularly until March 2022. He stopped attending for several months but reported that he reengaged in counseling in July 2022.

¶ 15 Downey testified that, in September 2021, respondent had a visit with B.D. during which B.D. found a can of malt liquor in respondent's bag. After the visit, B.D. began wetting his pants and "having a lot of trauma" because he was worried respondent was drinking alcohol. Respondent's visits with B.D. were suspended, and the visits resumed in June 2022. The visits occurred approximately once per month because B.D. did not want to see respondent more frequently than that. Respondent engaged with B.D. for the first 15 minutes of each visit, and B.D. had to entertain himself for the last 45 minutes of each visit. A.D. refused to attend any visits except for a visit that had been scheduled for the night before the hearing on the motion to terminate respondent's parental rights. Respondent did not attend the visit.

¶ 16 According to Downey, respondent had not made enough progress to move to unsupervised visits with the children because there were "a lot of unresolved issues." Downey believed the children's safety would be at risk because respondent sometimes fell asleep and was difficult to wake due to his medication. Respondent brought gifts for the children when he had visitation. He also regularly gave Downey gifts to give to the children, asked how they were doing, and asked when he could see them.

¶ 17 Downey stated respondent had many medical issues, including seizures, bipolar disorder, post-traumatic stress disorder, and "neurological issues." Downey indicated respondent sometimes appeared to be drunk. On several occasions, he fell asleep during supervised visits, and the case aides were unable to wake him. The case aides thought this was due to alcohol

consumption, but Downey believed it was from medications respondent was taking. Downey noted respondent had never tested positive for alcohol during the pendency of the case.

¶ 18     Downey stated her "guess" was that respondent was on between 20 and 25 different medications, but he had been working with his neurologist to reduce the number of medications he was taking. When Downey was assigned to the case in July 2021, respondent told her he had been seeing a neurologist and a psychiatrist or psychologist frequently. Respondent had worked with the neurologist regularly since Downey was assigned to the case, but Downey had not noticed a change in respondent's behavior. She said she would not be a "fair judge" of whether respondent was improving because she only saw him for 20 to 30 minutes at a time.

¶ 19     Downey testified respondent was asked to undergo a psychological evaluation. Downey drove him to Chicago for the in-person portion of the evaluation, which took about seven hours. There were several follow-up phone sessions, some of which Downey had to assist respondent with. Respondent fell asleep during one of the follow-up sessions. The evaluation recommended that respondent have three months of supervised visits, attend parenting classes, and then have a parenting capacity assessment. Respondent was referred to parenting classes, but he was discharged for failing to attend and turn in homework. He had been referred to parenting classes on two prior occasions as well, but he failed to attend. Respondent was unable to undergo a parenting capacity assessment because he did not complete parenting classes.

¶ 20     The matter was continued for approximately two weeks. When the hearing resumed, respondent testified he had participated in counseling, as he been directed to do. Respondent stated he was taking 22 medications when the case commenced but was currently only taking 9 medications. When he was on 22 medications, he suffered side effects, including tics and twitching, falling asleep, and slurred speech. Since reducing his medications, he suffered

from fewer tics and twitching, but he still suffered from the side effects of falling asleep and having slurred speech. He was not supposed to drink alcohol with his medications, but he last drank alcohol approximately three weeks before the hearing. Respondent attended parenting classes, but he was unable to remember what he had learned. He stated he used a service that "control[led]" and "individualize[d]" his prescribed medications so that he did not overdose.

¶ 21    Respondent offered as an exhibit a counseling treatment plan for the period from January 1, 2022, through March 31, 2022, which the court admitted into evidence. The treatment plan stated respondent had reported high levels of anxiety, stress, and depression. It stated he was engaged in weekly sessions and was making progress. It also stated respondent exhibited a "drastically altered mental status" during his initial sessions. He was slurring his speech, falling asleep, and seemed mentally impaired or under the influence. Respondent reported that his altered mental status was due to his medications, and he was working with medical providers to fix the issue. The treatment plan stated respondent's mental status had been "much improved" during his last four sessions.

¶ 22    The trial court found the State had proven by clear and convincing evidence that respondent was unfit as to all three counts alleged in the amended motions for termination of parental rights. The court noted respondent only interacted with B.D. for the first 15 minutes of his monthly visits with B.D. The court found respondent struggled with alcohol use, as he testified that he last drank alcohol three weeks prior to the hearing. The court observed that respondent's testimony was "extremely disjointed," and the court "questioned" whether respondent was under the influence of a substance or medication during his testimony. The court found respondent was difficult to understand, was "extremely disheveled," failed to answer simple questions, and appeared incoherent at times. The court acknowledged respondent was

taking "a substantial amount of medication," and he suffered from issues related to post-traumatic stress disorder, anxiety, and bipolar disorder. The court found respondent struggled to care for himself, and the children were no closer to being returned to his care than they were when the case was opened.

¶ 23 The matter proceeded to a best interests hearing. The court took judicial notice of the evidence and testimony presented at the unfitness hearing, two LSSI reports, and three reports prepared by the court-appointed special advocate (CASA). The LSSI reports and CASA reports discussed, among other issues, the children's adjustment to their foster home, their progress in school, and their medical care. The CASA reports stated A.D. reported respondent had threatened her and was mean to her when she lived with him. B.D. also stated respondent yelled at A.D. a lot. A.D.'s and B.D.'s three older half-siblings, who were teenagers or adults, indicated that, when the minors lived with respondent, he drank alcohol every day and often yelled at A.D. The CASA reports also stated A.D. and B.D. had adjusted well to their foster home, and A.D. indicated multiple times that she wanted to be adopted by her foster parents.

¶ 24 After hearing arguments, the court found it was in the best interests of the minors that respondent's parental rights be terminated. The court stated it had considered the best interest factors required under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) as well as the minors' unique needs, ages, and the situations that brought them into care. The court noted the children were "flourishing" in their foster parents' home and that the foster parents had ensured the children's physical, mental health, medical, and educational needs were met. The court found the minors needed stability, and it was clear from respondent's testimony, appearance, and demeanor that he was unable to care for the minors and was barely able to care for himself.

¶ 25      The court then conducted a permanency review, setting the minors' permanency goal as adoption and finding that DCFS, through LSSI, had made reasonable efforts.

¶ 26                                    II. ANALYSIS

¶ 27                              A. Finding of Unfitness

¶ 28      On appeal, respondent argues the trial court erred in finding the State had proven by clear and convincing evidence that he was unfit as alleged in all three counts in the amended motions for termination of parental rights because the State failed to prove DCFS made reasonable efforts to provide him with the services required under the service plans. Respondent contends DCFS's failure to make these services available prevented him from completing the services. Specifically, respondent notes the service plan approved January 27, 2021, stated DCFS was to provide a referral for a mental health assessment, but respondent did not actually receive a mental health assessment for several months. Respondent also notes that, although there was evidence throughout the case that he had psychological and neurological issues, a psychological evaluation was not conducted until March 2022. Respondent contends DCFS failed to explain to the minors that he appeared to be intoxicated sometimes due to his neurological issues and medications rather than substance abuse.

¶ 29      The involuntary termination of parental rights involves a two-step process. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). First, the State must show by clear and convincing evidence that a parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *D.F.*, 201 Ill. 2d at 494-95; see also 705 ILCS 405/2-29 (West 2020). If the trial court determines that a parent is unfit based on one or more of the grounds enumerated in section 1(D) of the Adoption Act, the court must then consider whether termination of parental rights is in the best interests of the child. *D.F.*, 201 Ill. 2d at 495; see also 705 ILCS 405/2-29(2) (West 2020).

We will not disturb a trial court's finding that a parent's unfitness has been proven by clear and convincing evidence unless the court's finding is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417 (2001).

¶ 30                                    1. *Forfeiture*

¶ 31            Initially, we find respondent has forfeited his argument that the State failed to prove he was unfit based on DCFS's alleged failure to make reasonable efforts to provide the services required by the service plans, as respondent failed to raise this issue in the proceedings in the trial court. See *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41 ("Generally, an issue that was not objected to during trial and raised in a posttrial motion is forfeited on appeal.").

¶ 32            Respondent has also forfeited his argument by failing to cite any authority supporting the proposition that the State was required to prove DCFS had made reasonable efforts to provide respondent with the services he needed to comply with the requirements of the service plans in order to prove respondent was unfit. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23 ("A failure to cite relevant authority violates Rule 341 and can cause a party to forfeit consideration of the issue."). Neither section 50/1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)), which defines parental unfitness, nor section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2020)), which concerns the procedure for the involuntary termination of parental rights, includes an express requirement that the State prove reasonable efforts on the part of DCFS in order to prove parental unfitness.

¶ 33            While respondent cites sections 2-13(4.5)(a-1)(iii) and 2-13.1 of the Juvenile Court Act of 1987 (*id.* §§ 2-13(4.5)(a-1)(iii), 2-13.1 (West 2020)) in support of his argument, neither of these statutory provisions set forth the elements the State must prove in order to

establish parental unfitness under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)).

¶ 34    Respondent also cites *In re Overton*, 21 Ill. App. 3d 1014 (1974), in support of his argument. However, *Overton* does not expressly support the proposition that the State must prove DCFS made reasonable efforts to provide the services required under a service plan in order to prove that a parent is unfit. Rather, the *Overton* court held that the State failed to prove by clear and convincing evidence that the respondent mother was unfit in that she failed to maintain a reasonable degree of interest, concern, or responsibility for her children's welfare because her caseworker discouraged her from visiting her children and thwarted her efforts to maintain contact. *Id.* at 1019. In the instant case, on the other hand, Downey did not discourage respondent from visiting his children, fail to communicate with him, or otherwise thwart his efforts to maintain contact with the children or complete services. While there were delays in obtaining some referrals for some services, respondent was eventually referred to all required services. Downey provided a considerable amount of assistance to respondent in his completion of some of the services.

¶ 35                    2. *Reasonable Efforts*

¶ 36    Forfeiture aside, even if we were to assume for purposes of this appeal the State was required to show DCFS made reasonable efforts to make the services in the service plans available in order to establish respondent was unfit, we would find the record shows DCFS made reasonable efforts in this case.

¶ 37    While there were delays in referring respondent for the mental health assessment, counseling, and the psychological evaluation, respondent was eventually referred to all of these services. Despite receiving these referrals, respondent failed to successfully complete the

services. A mental health assessment was completed in March 2021, and respondent began attending counseling in December 2021 or January 2022. However, he stopped attending counseling in March 2022 and reported that he reengaged in July 2022, which was around the time the motions for termination of his parental rights were filed. A psychiatric evaluation was conducted in March 2022, and it was recommended that respondent attend parenting classes and have supervised visitation with the children for three months, followed by a parenting capacity assessment. As a result of this recommendation, Downey referred respondent to parenting classes and arranged for him to have supervised visitation with B.D. once per month. B.D. was not willing to visit respondent more frequently than that, and A.D. was not willing to visit him at all. However, respondent was discharged from parenting classes for failing to attend and turn in his homework, and he only engaged with B.D. for the first 15 minutes of each of the monthly visits.

¶ 38       We note respondent also asserts on appeal that he did not begin receiving treatment for his mental health and cognitive difficulties until the psychological evaluation was conducted in March 2022, and he was given only a few months to make progress in treatment before the permanency goal was changed to substitute care pending decision on termination of parental rights. However, the record indicates respondent was being treated for his mental health issues long before the psychological evaluation was conducted. Downey testified respondent had been working with a neurologist and psychiatrist or psychologist to reduce his medications since at least July 2021. The record shows respondent received counseling services starting in December 2021 or January 2022 until he stopped attending in March 2022. The counseling treatment plan that was admitted into evidence indicated respondent had been working with medical providers to address the altered mental states caused by his medications during the period from January 2022 through March 2022.

¶ 39                              B. Best Interests Determination

¶ 40            Respondent also argues the trial court erred in finding the State had proven by a preponderance of the evidence that it was in the minors' best interests to terminate his parental rights. Respondent contends the State "effectively subverted [the] children's relationship with [him]" by failing to explain to them that his slurred speech and tendency to fall asleep were due to his medications rather than intoxication, as it "appear[ed] clear" that the minors assumed these behaviors were caused by alcohol consumption. Respondent argues the only "logical inference" from this is that the caseworker did not want to repair the relationship between him and the minors because she believed it was not in their best interests.

¶ 41            "At the best-interest portion of a termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this stage of the proceedings, the focus shifts from the parent to the child, and the issue is whether, in light of the child's needs, parental rights should be terminated. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Thus, "at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

¶ 42            Section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2020)) provides that when a best interest determination is required, the court must consider several enumerated factors in the context of the child's age and developmental needs. These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's
>
> identity; (3) the child's familial, cultural[,] and religious background and ties;
>
> (4) the child's sense of attachments, including love, security, familiarity,

- 14 -

continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006).

¶ 43        On review, we will reverse a trial court's best-interests determination only if it is against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." *Id.*

¶ 44        In the instant case, the trial court's best interests determination was not against the manifest weight of the evidence. The court stated it had considered all the statutory best-interests factors. The court found the minors needed stability, and their foster parents' home met their physical, mental health, medical, and educational needs. The court found, based on respondent's appearance, demeanor, and testimony, that he was unable to care for the children and could barely care for himself. The evidence also showed A.D. refused to attend visitation throughout the pendency of the case and indicated on multiple occasions that she wished to be adopted by her foster parents. B.D. refused to visit respondent more than once per month at the time of the termination hearing and was well-adjusted to his foster home. Under these circumstances, the facts did not clearly demonstrate the trial court should have reached the opposite result in making its best-interests determination.

¶ 45    In reaching our holding, we reject respondent's argument that the State "subverted" the children's relationship with him by failing to explain to the children that his slurred speech and tendency to fall asleep were due to medication side effects rather than alcohol consumption. Respondent's argument is speculative, as it is not clear from the record what the caseworkers told the children regarding respondent's condition. It is also not clear whether the children's reluctance to visit respondent was due to their belief that he was frequently intoxicated, as respondent assumes, or due to other factors, like respondent's behavior while they lived with him. Moreover, the alleged failure of the caseworkers to adequately explain respondent's medication side effects to the children has little relevance to a best interests hearing, where the focus is on needs of the children rather than the parent's interest in maintaining the parent-child relationship. See *D.T.*, 212 Ill. 2d at 364.

¶ 46                          III. CONCLUSION

¶ 47    For the reasons stated, we affirm the trial court's judgment.

¶ 48    Affirmed.